D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

| | |
|---|---|
| **NICHOLAS MONDELO,** | **CASE NO.** |
| **Plaintiff,** | |
| **v.** | |
| **QUINN, EMANUEL, URQUHART &** | **COMPLAINT** |
| **SULLIVAN, LLP, PETER CALAMARI, and** | |
| **DAVID ESKANOS,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

-----------------------------------------------------------x

### JURISDICTION AND VENUE

1.     Plaintiff brings this action against Defendants Quinn, Emanuel, Urquhart &
Sullivan, LLP, Peter Calamari, and David Eskanos, alleging claims of discrimination on the basis
of his Spanish ethnicity/ancestry/national origin and retaliation in violation of 42 U.S.C. § 1981;
the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New
York City Human Rights Law ("NYCHRL"), N.Y. Admin. Code § 8-101 *et seq.*

2.     This Court has original federal question jurisdiction under 28 U.S.C. § 1331
because this is an action brought under 42 U.S.C. § 1981. This Court has supplemental jurisdiction
over the state law claims because they are so related to the claims in this action within the Court's

original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

4.    Defendant Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), a California limited liability partnership, is a large business litigation firm -- the largest in the United States devoted solely to business litigation.

5.    Quinn Emanuel maintains a New York office in midtown Manhattan.

6.    Defendant Peter Calamari is a partner at Quinn Emanuel and was the managing partner of Quinn Emanuel's New York office until approximately March 2018.

7.    Defendant David Eskanos was Quinn Emanuel's Chief Information Officer during the period of Plaintiff's employment at Quinn Emanuel.

8.    Plaintiff Nicholas Mondelo ("Plaintiff") is Hispanic-American of Spanish ancestry and national origin who was employed by Quinn Emanuel as Regional Information Technology Director for U.S. East Coast and Midwest from approximately April 2015 to March 2018, when he was demoted to the position of New York Information Technology Manager.

9.    Plaintiff held the position of New York Information Technology Manager until he was terminated in May 2019.

10.    Before he was hired by Quinn Emanuel, Plaintiff had a successful 25-year IT career working at large international law firms, including BakerHostetler, Gibbons, P.C., and Milbank LLP.

## FACTS

11.　　In approximately April 2015, Plaintiff was hired by Quinn Emanuel as its Regional Information Technology ("IT") Director for U.S. East Coast and Midwest.

12.　　In this capacity, Plaintiff was responsible for managing the IT services for Quinn Emanuel's offices in New York, Washington D.C., and Chicago.

13.　　Plaintiff reported directly to Defendant Eskanos and Robert Shutt, Quinn Emanuel's Director of Information Technology.

14.　　Both Defendant Eskanos and Mr. Shutt were based at Quinn Emanuel's headquarters in Los Angeles.

15.　　From the date of his hire until approximately September 2015, Plaintiff—one of the only Hispanics in Quinn Emanuel's IT Department and the only employee in the Department of Spanish ancestry and national origin—was subjected to a constant stream of harassment, ridicule, and abuse from Mr. Eskanos.

16.　　For example, Mr. Eskanos frequently cursed at and insulted Plaintiff, calling him "worthless" and "stupid."

17.　　Mr. Eskanos also frequently mocked and threatened to fire Plaintiff during public telephone conferences with Plaintiff and Plaintiff's staff.

18.　　Mr. Eskanos's abuse escalated in September 2015 when Mr. Eskanos called Plaintiff a "spic" after Plaintiff informed him that he was traveling to Spain to visit family members.

19.　　After Mr. Eskanos made this comment, Plaintiff initiated a formal complaint of hostile work environment against Mr. Eskanos with Debbie Klaeger, Quinn Emanuel's Director of Human Resources.

20.     Upon information and belief, numerous other complaints, both formal and informal, had been lodged against Mr. Eskanos by other employees of Quinn Emanuel's IT Department alleging racist and sexist behavior by Mr. Eskanos.

21.     Despite these numerous complaints, Mr. Eskanos, who had been with Quinn Emanuel since the firm was founded, retained his position as CIO.  In fact, Mr. Eskanos had a reputation within the firm as being "untouchable."

22.     After receiving Plaintiff's complaint about Mr. Eskanos's blatant racism and ethnic hostility, Quinn Emanuel continued to not only employ Mr. Eskanos in a position of authority, but also continued to require Plaintiff to work under him.

23.     Quinn Emanuel never informed Plaintiff of any disciplinary action taken against Mr. Eskanos for his vile slur and/or his racism against Plaintiff.  Nothing material changed in terms of Mr. Eskanos's position as Quinn Emanuel's CIO or his overall authority over Quinn Emanuel's IT Department.

24.     The only action Quinn Emanuel took in response to Plaintiff's complaint of which Plaintiff is aware, was to inform Plaintiff that Peter Calamari, the then-managing partner of Quinn Emanuel's New York office, and Richard Schirtzer, the then-managing partner of Quinn Emanuel's Los Angeles Office, would act as a "buffer" between Plaintiff and Mr. Eskanos.

25.     Under this arrangement, from approximately October 2015 through March 2018, Plaintiff continued to receive instructions from Mr. Eskanos though IT Managers in Quinn Emanuel's Los Angeles office (including Robert Shutt) and had to directly interface with Mr. Eskanos to obtain his approval for certain issues, but could request assistance from Mr. Calamari in Quinn Emanuel's New York office.

26.     This arrangement allowed Mr. Eskanos to continue singling Plaintiff out and sabotaging Plaintiff's ability to succeed at the firm.

27.     For example, before Plaintiff traveled to Quinn Emanuel's offices in Washington D.C. or Chicago, he was required to submit to Mr. Eskanos "executive reports" detailing all the reasons justifying the need for his travel, which Mr. Eskanos frequently denied or questioned.

28.     Plaintiff was informed by his counterpart Regional IT Directors in Quinn Emanuel's Los Angeles and European offices that Mr. Eskanos never requested such justification for their travel, and simply approved their travel expense reports.

29.     Mr. Eskanos also interfered with Plaintiff's ability to service the attorneys in the offices for which Plaintiff was responsible. For example, Quinn Emanuel generally leased the computers used by attorneys and other staff. Several times per year, the leases on a portion of the computers in Quinn Emanuel's New York office would expire. One of Plaintiff's duties was to order the new computers necessary to replace those for which the leases were expiring. Plaintiff submitted his order requests to Mr. Eskanos for approval.  Mr. Eskanos on numerous occasions refused to act on Plaintiff's order requests despite Plaintiff's numerous requests for him to do so, which resulted in the new computers not being received in time to be installed before the leases on the old computers expired. After this occurred, Mr. Eskanos would aggressively question Plaintiff as to why the new computers had not been installed and why Quinn Emanuel was incurring additional expenses on the computers with expired leases. In conversations with Plaintiff's counterpart Regional IT Directors he was informed that they did not experience the same delayed approval for their budgeting requests from Mr. Eskanos.

30.     Eventually, Plaintiff brought this issue to the attention of Mr. Schirtzer. Again, Quinn Emanuel refused to discipline or take any action against Mr. Eskanos. Instead, Mr. Schirtzer simply took over responsibility for approving Plaintiff's budgeting requests and order forms.

31.     Mr. Eskanos also sabotaged Plaintiff by imposing unrealistic deadlines and refusing to provide Plaintiff with the resources necessary to perform his duties. For example, when the computer leases expired on a group of computers in Quinn Emanuel's New York office, Plaintiff was required to remove and replace approximately 150 old computers and then install and set up the new replacement computers. Even though the New York office was Quinn Emanuel's largest office, Mr. Eskanos required Plaintiff to complete this task within two weeks but never approved overtime for Plaintiff or his staff to complete the project within that timeframe. Plaintiff was informed by his counterpart Regional IT Directors that Mr. Eskanos regularly approved overtime for their staff to complete such replacements.

32.     In approximately early 2018, Quinn Emanuel moved the location of its Washington D.C. office.  Plaintiff was responsible for overseeing the move of all Quinn Emanuel's IT infrastructure from the old office location to the new office. The goal was to complete the IT move over the course of a long weekend in January 2018.

33.      In preparation, Plaintiff prepared a budget for the resources needed to effectively and efficiently accomplish this task within the goal timeframe. He first presented the draft budget to Mr. Calamari, who assisted him with crafting a letter to Mr. Eskanos explaining the reasons for the requested budget.

34.     After Plaintiff forwarded the budget to Mr. Eskanos, he was informed by Mr. Schirtzer that his budget request had been denied because Mr. Eskanos felt that it was "too much." Mr. Schirtzer also told Plaintiff that he was being stripped of his responsibility for the Washington

D.C. move, that Mr. Eskanos would handle it, and that Mr. Eskanos had ordered Robert Shutt to take over responsibility for the move. Thus, rather than protecting or assisting Plaintiff, Mr. Schirtzer instead enabled and carried out Eskanos's discriminatory and retaliatory actions.

35.    Mr. Shutt failed to complete the move within the long weekend timeframe, leaving incomplete the setup of numerous computers, printers, and other IT infrastructure. Plaintiff was required to spend nearly one additional month completing the move and correcting errors caused by Mr. Shutt.

36.    Throughout the period Mr. Calamari acted as the "buffer" between Plaintiff and Mr. Eskanos, Plaintiff informed Mr. Calamari on numerous occasions about Mr. Eskanos's unequal treatment and interference with his ability to do his job. Despite his numerous complaints to Mr. Calamari, Quinn Emanuel took no action against Mr. Eskanos during this period. Instead, Mr. Calamari simply advised Plaintiff to "try to work it out" before bothering him with any issues.

37.    In approximately March 2018, Mr. Calamari informed Plaintiff that he would no longer be the managing partner of Quinn Emanuel's New York office and therefore the arrangement by which Mr. Calamari acted as the "buffer" between Plaintiff and Mr. Eskanos would not continue.

38.    The same month the "buffer" arrangement ended, Quinn Emanuel – without informing Plaintiff – hired Kenneth Mitchell into Quinn Emanuel's Washington D.C. office and gave him Plaintiff's title of Regional IT Director for the U.S. East Coast.

39.    When Mr. Mitchell was hired, Quinn Emanuel demoted Plaintiff to IT Director for only Quinn Emanuel's New York office and stripped him of his responsibilities for Quinn Emanuel's Washington D.C. and Chicago offices.

40.     Plaintiff only learned about Mr. Mitchell's hiring and his demotion in an email sent by Mr. Mitchell introducing himself to the office.

41.     Under the new arrangement, Mr. Mitchell reported directly to Mr. Eskanos, and Plaintiff reported to Mr. Mitchell.

42.     From March 2018 through May 2019, Mr. Eskanos, through Mr. Mitchell, continued his practice of singling Plaintiff out for discriminatory and retaliatory treatment by imposing unreasonable expectations, denigrating the quality of his work, and setting him up for failure.

43.     In approximately December 2018, Plaintiff was approved to take occasional leave pursuant to the Family Medical Leave Act ("FMLA") to care for his son – a veteran who suffered from post-traumatic stress disorder ("PTSD").

44.     Beginning in approximately early 2019, a major issue faced by Quinn Emanuel's IT department was the upgrade of all Quinn Emanuel's computers from Windows 7 to Windows 10.

45.     The Windows 10 rollout faced significant difficulties in all of Quinn Emanuel's offices. In the London office, for example, the Windows rollout was put on hold after the attorneys in that office experienced significant issues with the new operation system and the IT Director of the London office, Kurt Pfaender, complained to Mr. Eskanos that the rollout was not feasible.

46.     Despite the negative experience of the London office, Mr. Eskanos, through Mr. Mitchell, continued to push Plaintiff to complete the rollout of Windows 10 in the New York office.

47.     At that time, Quinn Emanuel's New York office was its largest office in the world in terms of the number of users who needed to have their computer systems upgraded to Windows

10.  Adding to the complexity of the Windows 10 rollout in the New York office was the fact that the servers used by the computer systems in New York were in Los Angeles, not New York.

48.     In an attempt to complete the rollout in a manner that caused the least disruption to the attorneys in the New York office, Plaintiff began testing Windows 10 with a small group of partners, including Andrew Charlson, Kevin Reed, and Todd Antem.

49.     The Windows 10 testing on this test group was a disaster. Over the course of several months, Plaintiff and his team received numerous complaints from the partners in the group that their machines and software on those machines were not working with the new operating system. Exacerbating the issue was that each time a partner experienced a difficulty with the new system, Plaintiff and his team had to reimage the entire hard drive of the faulty computer, copy all the files to a new computer, and give the partner a new system. This caused extreme disruption to the partners' work.

50.     As a result of the constant disruption, partners in the test group began refusing Windows 10.

51.     As a result of the negative experiences of the test group, Plaintiff informed Mr. Mitchell that the New York office, like the London office, was not ready for a full-scale rollout of Windows 10 and that additional preparatory work had to be done before changing over all machines in the office to Windows 10.

52.     As IT Director for the New York office, Plaintiff was accountable to, and received his performance reviews and evaluations from, the attorneys and partners in that office. Moreover, whenever those partners and other attorneys had an IT issue, they dealt with Plaintiff and his team, not the LA office. Thus, if the full-scale rollout of Windows 10 caused major issues in the New York office – which the experiences of the test group showed that it would – Plaintiff would suffer

the repercussions and be held directly responsible for those issues by the New York partners/attorneys.

53.     Mr. Mitchell rejected Plaintiff's concerns about the Windows 10 rollout, informing him that it was "LA's orders" – i.e., Mr. Eskanos's orders – that the full-scale rollout of Windows 10 be completed in the New York office.

54.     In the Spring of 2019, Plaintiff sought assistance from Peter Calamari, informing Mr. Calamari about his concerns with the Windows 10 rollout and about the order to complete that rollout for the New York office. Calamari refused to assist Plaintiff.

55.     Faced with orders to complete the rollout, but knowing that he would reap the repercussions of any issues caused by the rollout in the New York office, Plaintiff repeatedly asked Mr. Mitchell to notify all attorneys and staff in the New York office that the Windows 10 rollout was being completed at the direction of Mr. Eskanos as Quinn Emanuel's CIO.

56.     In approximately April 2019, Plaintiff met with Mr. Mitchell and Ms. Fogler, who informed him that he had to "follow orders" received from the LA office (i.e., from Eskanos) "no matter what."

57.     During the meeting, Plaintiff showed Mr. Mitchell and Ms. Fogler the emails from partners in the test group complaining about the Windows 10 system.

58.     Plaintiff informed Ms. Fogler and Mr. Mitchell that he was being targeted by being required to roll out a system that Mr. Eskanos knew had serious issues and would cause major disruption in the New York office.

59.     Plaintiff expressed his view that if Mr. Eskanos wanted the rollout to occur despite the numerous issues that had been experienced by the test group, then it was incumbent upon him to notify all the New York partners that the rollout was being done at his direction.

60.     In response, Mr. Mitchell and Ms. Folger told Plaintiff that Mr. Eskanos "would not accept responsibility for that."

61.     It was thus apparent that not only was Mr. Eskanos willing to sacrifice the productivity of the firm's entire New York office for the sole purpose of humiliating Plaintiff and that Quinn Emanuel, rather than protecting Plaintiff, was allowing Mr. Eskanos to do it.

62.     To be clear, by this point, Quinn Emanuel knew that Mr. Eskanos had openly called Plaintiff a "spic." Quinn Emanuel knew, through Plaintiff's complaints to Mr. Calamari and Mr. Schirtzer, that Mr. Eskanos had constantly singled out and sabotaged Plaintiff's ability to do his job for years. And yet, rather than take any disciplinary action against Mr. Eskanos, Quinn Emanuel instead (1) had demoted Plaintiff and gave his job to Mr. Mitchell without even having the courtesy to inform Plaintiff beforehand; and (2) was knowingly allowing Mr. Eskanos to hang Plaintiff out to dry with respect to the Windows 10 rollout in the New York office, thus encouraging and enabling his discriminatory and retaliatory conduct.

63.     Plaintiff, who was already severely stressed by the discriminatory and retaliatory treatment he had suffered over the years, the lack of support from his employer, and the constant pressure from Mr. Eskanos to roll out Windows 10 prematurely, could not take it any longer.

64.     On May 10, 2019, Plaintiff suffered a breakdown and was involuntarily committed to the Jersey City Medical Center for three days.

65.     On May 18, 2019, Plaintiff sent a text message to Jennifer Barrett, one of the managing partners of Quinn Emanuel's New York office, in which he informed her that he needed to discuss Ms. Folger and Mr. Mitchell's conduct.

66.     On May 19, 2019, Plaintiff was instructed to appear on a conference call with several partners in Quinn Emanuel's New York office during which Quinn Emanuel terminated Plaintiff's employment.

67.     Later that day, Plaintiff was involuntarily committed for a second time and was diagnosed with bipolar disorder.

68.     Throughout his employment with Quinn Emanuel, Plaintiff consistently received outstanding performance reviews from the attorneys in Quinn Emanuel's New York office.

69.     Plaintiff has been unable to secure new employment since his May 2019 termination.

70.     In January 2020, Plaintiff was hospitalized after he attempted to commit suicide.

**FIRST CLAIM FOR RELIEF**
**Race/Ancestry Discrimination & Hostile Work Environment**
**(42 U.S.C. § 1981)**
**(Against Defendant Quinn Emanuel)**

71.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

72.     In violation of 42 U.S.C. § 1981, Quinn Emanuel intentionally discriminated against Plaintiff on the basis of his Hispanic race and/or his Spanish ancestry.

73.     Quinn Emanuel's discriminatory acts included, but were not limited to, subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment.

74.     As a direct and proximate result of Quinn Emanuel's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

75.     As a direct and proximate result of Quinn Emanuel's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

76.     Quinn Emanuel's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

77.     As a result of Quinn Emanuel's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages; damages for emotional distress; punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

**SECOND CLAIM FOR RELIEF**
**Retaliation**
**(42 U.S.C. § 1981)**
**(Against Defendant Quinn Emanuel)**

78.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

79.     In violation of 42 U.S.C. § 1981, Quinn Emanuel intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of discrimination based on his Hispanic race and/or Spanish ancestry.

80.     Quinn Emanuel's retaliatory and discriminatory acts included, but were not limited to, subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment.

81.     As a direct and proximate result of Quinn Emanuel's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to,

loss of income, including past and future salary.

82.    As a direct and proximate result of Quinn Emanuel's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

83.    Quinn Emanuel's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

84.    As a result of Quinn Emanuel's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to lost wages; damages for emotional distress; punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

### THIRD CLAIM FOR RELIEF
### Discrimination/Hostile Work Environment
### (New York City Human Rights Law ("NYCHRL") - N.Y.C. Admin. Code § 8-107(7))
### (Against Defendants Quinn Emanuel and David Eskanos)

85.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

86.    In violation of the NYCHRL, Quinn Emanuel and David Eskanos intentionally discriminated against Plaintiff on the basis of his race and/or his Spanish ancestry/ethnicity/national origin.

87.    The discriminatory acts of Quinn Emanuel and David Eskanos included, but were not limited to, subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment.

88.    As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful

conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

89.     As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

90.     The conduct of Quinn Emanuel and David Eskanos was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

91.     As a result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress, physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**Retaliation**
**(New York City Human Rights Law - N.Y.C. Admin. Code § 8-107(7))**
**(Against Defendants Quinn Emanuel and David Eskanos)**

92.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

93.     In violation of the NYCHRL, Quinn Emanuel and David Eskanos intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of discrimination/harassment based on his race and/or his Spanish ethnicity/ancestry/national origin.

94.     The retaliatory and discriminatory acts of Quinn Emanuel and David Eskanos included, but were not limited to, subjecting Plaintiff to a hostile work environment, increased

scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment.

95.     Each of the retaliatory and discriminatory acts perpetrated against Plaintiff was reasonably likely to deter a person from engaging in protected activity.

96.     As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

97.     As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

98.     The conduct of Quinn Emanuel and David Eskanos was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

99.     As a result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress, physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**Discrimination/Hostile Work Environment**
**(New York State Human Rights Law ("NYSHRL") - N.Y. Exec. Law § 296 *et seq.*)**
**(Against Quinn Emanuel and David Eskanos)**

100.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

101.    In violation of the NYSHRL, Quinn Emanuel and David Eskanos intentionally

discriminated against Plaintiff of the basis of his race and/or his Spanish ethnicity/ancestry/national origin.

102.     The discriminatory acts of Quinn Emanuel and David Eskanos included, but were not limited to, subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment.

103.     As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

104.     As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

105.     The conduct of Quinn Emanuel and David Eskanos was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

106.     As a result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress, physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
#### Retaliation
**(New York State Human Rights Law - N.Y. Exec. Law § 296 *et seq.*)**
**(Against Quinn Emanuel and David Eskanos)**

107.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they

were set forth again herein.

108.    In violation of the NYSHRL, Quinn Emanuel and David Eskanos intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of discrimination/harassment based on his Spanish ethnicity/ancestry/national origin.

109.    The retaliatory and discriminatory acts of Quinn Emanuel and David Eskanos included, but were not limited to, subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment.

110.    Each of the retaliatory and discriminatory acts perpetrated against Plaintiff was reasonably likely to deter a person from engaging in protected activity.

111.    As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial monetary damages, including, but not limited to, loss of income, including past and future salary.

112.    As a direct and proximate result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to emotional distress, physical pain and suffering, damage to Plaintiff's good name and reputation, lasting embarrassment, and humiliation.

113.    The conduct of Quinn Emanuel and David Eskanos was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.

114.    As a result of Quinn Emanuel and David Eskanos's unlawful conduct, Plaintiff is entitled to compensatory damages, including but not limited to damages for emotional distress,

physical injuries, and medical treatment; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Discrimination/Retaliation
**(New York City Human Rights Law - N.Y.C. Admin. Code § 8-107(6))**
**(Against Defendant Peter Calamari)**

115.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

116.    The NYCHRL prohibits conduct that aids and abets unlawful discrimination and/or retaliation.

117.    In violation of the NYCHRL, Defendant Peter Calamari aided and abetted the discriminatory and retaliatory conduct of David Eskanos by participating in that conduct, enabling that conduct, and/or failing to adequately investigate and take adequate remedial action in response to that conduct.

118.    As a direct and proximate result of Peter Calamari's unlawful conduct, Plaintiff has suffered, and continues to suffer harm and is entitled to all legal and equitable remedies under the NYCHRL, including compensatory damages; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
### Aiding and Abetting Discrimination/Retaliation
**(New York State Human Rights Law - N.Y. Exec. Law § 296(6))**
**(Against Defendant Peter Calamari)**

119.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

120.    The NYSHRL prohibits conduct that aids and abets unlawful discrimination and/or retaliation.

121.    In violation of the NYSHRL, Defendant Peter Calamari aided and abetted the discriminatory and retaliatory conduct of David Eskanos by participating in that conduct, enabling that conduct, and/or failing to adequately investigate and take adequate remedial action in response to that conduct.

122.    As a direct and proximate result of Peter Calamari's unlawful conduct, Plaintiff has suffered, and continues to suffer harm and is entitled to all legal and equitable remedies under the NYSHRL, including compensatory damages; punitive damages; attorneys' fees and costs; and such other legal and equitable relief as this Court deems just and proper.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

(a)    Enter a declaratory judgment that the acts and practices of Defendants complained of herein are in violation of 42 U.S.C. § 1981 and the laws of the State and City of New York.

(b)    Enjoin and permanently restrain Defendants' violations of 42 U.S.C. § 1981 and the laws of the State and City of New York.

(d)    Award Plaintiff damages including, but not limited to, lost wages, compensation for his humiliation and emotional distress and suffering, in an amount to be determined at trial, and punitive damages, together with interest thereon from the time of the initial loss until satisfaction of judgment as well as with post-judgment interest thereon;

(e)    Award Plaintiff the costs of this action, together with reasonable attorney's fees;

(f)    Grant Plaintiff such other and further relief this Court deems necessary and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury on all counts so triable.


Dated: New York, New York
March 23, 2021

Respectfully submitted,

JOSEPH & KIRSCHENBAUM LLP

By: _____
D. Maimon Kirschenbaum
Lucas C. Buzzard
32 Broadway
Suite 601
New York, NY 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiff*