UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 2/22/2022

NICHOLAS MONDELO,

Plaintiff,

-against-

QUINN, EMANUEL, URQUHART &
SULLIVAN, LLP, PETER CALAMARI, and
DAVID ESKANOS,

Defendants.

No. 21 Civ 02512 (CM)

## DECISION AND ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING  DEFENDANTS'
## MOTION TO STAY DISCOVERY

Plaintiff Nicholas Mondelo sues his former employer, the law firm Quinn, Emanuel,

Urquhart & Sullivan, LLP, and two of its partners, Peter Calamari, and David Eskanos (together,

"Defendants"), for employment discrimination on the basis of Plaintiff's Spanish

ethnicity/ancestry/national origin, in violation of 42 U.S.C. § 1981 ("Section 1981"), the New

York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the

"NYCHRL"). Plaintiff seeks a permanent injunction restraining Defendants from further violating

the relevant employment discrimination laws and an award of compensatory damages, punitive

damages, and attorney's fees.

Defendants move to dismiss Plaintiff's action for failure to state a claim and further moves

to stay discovery pending a resolution of that motion.

Defendants' motion to dismiss the Amended Complaint is granted in part and denied in

part. Defendants' motion for a stay of discovery is denied as moot.

1

## BACKGROUND

The gravamen of the Amended Complaint is that Defendant David Eskanos, Plaintiff's supervisor at Quinn Emanuel Urquhart & Sullivan, LLP, discriminated against Plaintiff because he is Hispanic and of Spanish ancestry and national origin. Plaintiff alleges that Eskanos subjected him to continuous harassment and abuse over a period of years and made it impossible for him to perform his duties as a Regional Director of Information Technology. Specifically, he pleads that Eskanos treated Plaintiff much worse than he did the firm's other IT directors, none of whom is Hispanic. Eskanos's conduct purportedly created a hostile work environment for Plaintiff in violation of federal, state, and city employment discrimination law.

Plaintiff also alleges that Defendant Quinn Emanuel Urquhart & Sullivan, LLP is also liable for Eskanos's unlawful, discriminatory conduct, as is Defendant Peter Calamari, the former managing partner of the New York office, who temporarily served as a "buffer" between Plaintiff and Mr. Eskanos.

Plaintiff initiated this action by filing a complaint on March 23, 2021. *See* Dkt. No. 1. Defendants moved to dismiss the original complaint on July 12, 2021. *See* Dkt. No. 14. Rather than respond to the motion, Plaintiff filed a superseding amended complaint on August 2, 2021. *See* Dkt. No. 20, (the "Amended Complaint"). On August 17, 2021, Defendants promptly moved to dismiss the Amended Complaint, and sought a stay of discovery pending the resolution of their motion to dismiss. *See* Dkt. No. 23.

I.  Parties

Plaintiff Nicholas Mondelo is a Hispanic-American individual of Spanish ancestry and national origin. Amended Complaint ("Am. Compl.") ¶ 8. Mr. Mondelo was employed by Defendant Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel" or the "Firm") as

2

Regional Information Technology Director for U.S. East Coast and Midwest from approximately April 2015 to March 2018, at which time he was demoted to the position of New York Information Technology Manager. *Id.* Mr. Mondelo held the position of New York Information Technology Manager until he was fired in May 2019. *Id.* ¶ 9. Before he was hired by Quinn Emanuel, Mondelo "had a successful 25-year IT career working at large international law firms, including BakerHostetler, Gibbons, P.C., and Milbank LLP." *Id.* ¶ 10.

Defendant Quinn Emanuel, a California limited liability partnership, is a large, business litigation-focused law firm. According to the Amended Complaint, Quinn Emanuel is the largest law firm in the United States that is devoted solely to business litigation. Am. Compl. ¶ 4.

Defendant Peter Calamari is a partner at Quinn Emanuel; he was the managing partner of Quinn Emanuel's New York office at all relevant times until approximately March 2018. Am. Compl. ¶ 6.

Defendant David Eskanos was Quinn Emanuel's Chief Information Officer ("CIO") for the duration of Mr. Mondelo's time at the Firm. Am. Compl. ¶ 7.

II.    Factual Background

Mr. Mondelo was hired by Defendant Quinn Emanuel in April 2015 to serve as the Firm's Regional Information Technology ("IT") Director for the U.S. East Coast and Midwest. Am. Compl. ¶ 11. Mondelo was based out of the Firm's New York office but oversaw the Firm's IT operations for the New York, Washington DC, and Chicago offices. *Id.* ¶ 11-12.

Mondelo alleges that he was the only member of the Firm's IT department of Spanish ancestry, one of the only Hispanics in the entire department, and the only Hispanic Regional IT Director. *Id.* ¶¶ 18, 34. During at least one of the several Skype interviews Mondelo had with

Eskanos prior to being hired, Mondelo informed Eskanos of his future plans to travel to Spain to visit his family. *Id.* ¶ 13.

When Mr. Mondelo started working for the Firm in April of 2015, he reported directly to Eskanos. Eskanos worked out of the Firm's Los Angeles headquarters (*Id.* ¶¶ 12-15) but he had complete authority over the Firm's entire IT Department and was responsible for hiring all of the Firm's IT personnel. *Id.* ¶ 16. Mondelo also reported to Robert Shutt, the IT Director of the entire Firm, who was also based out of the LA office. *Id.* ¶ 14.

Mondelo alleges that, starting the day he was hired in April 2015, he was subjected to a constant stream of harassment, ridicule, and abuse from his supervisor, Mr. Eskanos. Am. Compl. ¶¶ 18-21. From the start, Eskanos made a habit of mocking and threatening to fire Mondelo on telephone conferences with Mr. Mondelo's staff, and of insulting Mondelo by calling him "worthless" and "stupid." *Id.* ¶¶ 19-20.

    A. *Mondelo complains to HR about Eskanos's conduct.*

In September 2015, Mondelo informed Eskanos that he would be travelling to Spain to visit his family soon. Eskanos responded by calling him a "spic." Am. Compl. ¶ 21. Mondelo immediately filed a formal complaint with the Firm's Human Resources ("HR") department. *Id.* ¶ 22. Plaintiff informed Quinn Emanuel's HR personnel that Eskanos called him a "spic," and that Eskanos had, on many occasions, degraded Mondelo and his Spanish culture. *Id.* According to Mondelo, he was not the first to complain about Eskanos. Rather, "numerous other complaints, both formal and informal, had been logged against Mr. Eskanos by other employees of Quinn Emanuel's IT Department alleging racist and sexist behavior by Mr. Eskanos." *Id.* ¶ 23.

Notwithstanding the numerous complaints purportedly lodged about Mr. Eskanos's treatment of his employees, the Firm refused to take any disciplinary action against him. After

receiving Mondelo's complaint about Eskanos's "blatant racism and ethnic hostility, Quinn Emanuel continued not only to employ Mr. Eskanos in a position of authority, but also continued to require Plaintiff to work under him." *Id.* ¶ 25. Mondelo alleges that Eskanos, who had been with the Firm since its founding, had a reputation within Quinn Emanuel as being "untouchable." *Id.* ¶ 24.

The only action taken by Quinn Emanuel in response to Mondelo's complaint was to inform Mr. Mondelo that Defendant Peter Calamari, then-managing partner of the New York office, and Richard Schirtzer, then-managing partner of the Los Angeles office, would act as "buffers" between Mondelo and Eskanos. Am. Compl. ¶ 27. To his dismay, Mr. Mondelo continued to receive instructions from Eskanos through IT personnel in Quinn's Los Angeles office, and he had no choice but to communicate directly with Eskanos via email to obtain Eskanos' approval for various projects. But at least the arrangement meant that Mondelo "no longer had any verbal communication with Mr. Eskanos and could request assistance from Mr. Calamari in Quinn Emanuel's New York office." *Id.* ¶ 28.

> B. *Eskanos continues to antagonize Mondelo.*

While Eskanos was no longer able to harass verbally Mondelo under the buffer arrangement, Mondelo alleges that Eskanos found ways to continue singling him out. Generally, Eskanos continued to treat Mondelo less favorably than he did Mondelo's fellow IT Directors, none of whom was Hispanic or of Spanish ancestry and none of whom had filed an internal complaint against Eskanos. Am. Compl. ¶¶ 18, 34. Eskanos' purportedly differential treatment of Mondelo was unrelenting.

For example, Eskanos began excluding Mondelo from the weekly IT managers' meetings, which were held to discuss important IT issues and to develop firm-wide IT strategies. Am.

Compl. ¶ 32.  And, "from the Fall of 2015 through May 2019, Mr. Eskanos ensured that Plaintiff's IT department in New York remained understaffed." Am. Compl. ¶ 30. Two IT employees in the New York office quit in 2015. Mondelo "repeatedly and for years" asked Eskanos directly for permission to hire replacements. *Id.* Eskanos either informed Mondelo that there was no need to hire any more staff or directed Mondelo to send him (Eskanos) the resumes of possible replacements. *Id.* Eskanos never hired anyone to fill the two open IT positions in the New York office, and "the chronic understaffing of Quinn Emanuel's New York office meant that Plaintiff, the only salaried employee in the New York IT department, was required to work longer hours in order to ensure that the department's work was completed." Am. Compl. ¶ 31.

Eskanos also treated Mondelo differently than his Regional IT Director counterparts when it came to approving travel and travel expenses. *Id.* ¶¶ 33-34.  Eskanos required Mondelo to submit quarterly requests justifying his need to travel to the other offices that fell under his jurisdiction, and then frequently denied those requests.  *Id.* ¶ 33. By contrast, Eskanos did not require that the other (non-Hispanic) Regional IT Directors submit such requests; he simply approved their travel expense reports.  *Id.* ¶ 34.

Eskanos imposed unrealistic deadlines and budgets on Mondelo's work projects and then refused to provide him with the resources necessary to complete those projects. Am. Compl. ¶ 31. For example, Eskanos gave Mondelo two weeks to replace all of the old computers in the New York office (the Firm's largest office) with new computers. Eskanos never approved overtime for Mondelo and his staff to complete the job, even though he did approve overtime for Mondelo's counterparts elsewhere to complete the same project with their staff for their respective offices. *Id.* Another example occurred in early 2018, when the Firm's Washington D.C. office was moving from one building to another.  Mondelo was responsible for the move. He created a draft budget

proposal detailing the budget required to complete the move and presented it to Mr. Calamari. Calamari approved the budget and Mondelo forwarded it to Eskanos. Eskanos denied the budget request outright, stating it was "too much," and then stripped Mondelo of his responsibilities related to the D.C. office move. Am. Compl. ¶ 34.

Mondelo alleges that throughout the buffer arrangement period (September 2015 – March 2018), he informed Mr. Calamari on several occasions of Eskanos's persisting unequal treatment and harassment. Am. Compl. ¶ 45. On several occasions, Mondelo "specifically informed Mr. Calamari that he believed Mr. Eskanos was retaliating against him for complaining about discrimination." *Id.* As far as Mondelo is aware, neither the Firm nor Mr. Calamari took any disciplinary action against Eskanos in response to Plaintiff's complaints to Calamari. "Instead, Mr. Calamari simply advised Plaintiff to 'try to work it out' before bothering him with any issues." *Id.*

### C.   *The buffer period ends and Eskanos demotes Mondelo.*

In March 2018, Calamari informed Plaintiff that he would no longer be managing partner of the New York office, so the buffer arrangement would end. Am. Compl. ¶ 46. No sooner had the buffer arrangement dissolved than Eskanos demoted Plaintiff to IT Director for just the New York office, stripping him of his responsibilities for the Washington D.C. and Chicago offices. *Id.* ¶¶ 47- 49. Eskanos replaced Plaintiff with Kenneth Mitchell, who is not Hispanic, and directed Plaintiff to report to Mitchell. *Id.* ¶ 49.

Beginning in early 2019, Eskanos ensured that Plaintiff did not have the resources or the support necessary to successfully accomplish a major operating system upgrade from Windows 7 to Windows 10. *Id.* ¶¶ 54-79. At the time, the New York office was Quinn Emanuel's largest office in the world, with over 800 employees (attorneys and staff) whose computers had to be upgraded

to the new system. *Id.* ¶ 57. Eskanos undercut Plaintiff's ability to successfully rollout the new system in a number of ways.

First, Eskanos refused to allow Mondelo to directly interface with crucial technical support personnel at Microsoft, although Mondelo's counterparts were permitted to do so. Am. Compl. ¶¶ 58-60. Second, Eskanos refused to authorize overtime for Plaintiff's IT staff or to offer additional support to attorneys with any issues arising out of the rollout. *Id.* ¶ 67. Mondelo first tested Windows 10 with a small group of partners and it was a disaster. At the same time, IT director of the London office Kurt Pfaender (who is not Hispanic) faced similar issues with the rollout in his "much smaller" London office, but Eskanos allowed him to put the London office rollout on hold. *Id.* ¶¶ 55-57. But when Mondelo sought to similarly pause the rollout in New York, so that he could perform additional preparatory work, Eskanos denied the request and pressured him to complete the rollout. *Id.* ¶¶ 64, 68. All the while, Eskanos refused to tell the New York attorneys that the rollout was being done at his direction, effectively ensuring that Mondelo would take the blame for a botched rollout. *Id.* ¶¶ 70-76. Mondelo again sought Calamari's assistance, but Calamari refused to help. *Id.* ¶ 69.

The Windows 10 rollout was the last straw for Mondelo, who "was already severely stressed by the discriminatory and retaliatory treatment he suffered over the years." *Id.* ¶ 79. On May 10, 2019, "as a result of the stress caused by the ongoing discrimination and retaliation by Mr. Eskanos," Mondelo suffered a breakdown and was involuntarily committed to a psychiatric ward for three days. *Id.* ¶ 80. Following his release, Mondelo admits that he "was in an extremely poor mental state," that he acted erratically, and that he could no longer perform his job duties. *Id.* ¶ 81. He was fired on May 19, 2019, on a conference call with several New York partners. Later that day, he was involuntarily committed again. *Id.* ¶¶ 83-84.

Mondelo asserts that he has not been able to secure employment since his termination from the Firm. *Id.* ¶¶ 86-87.

## DISCUSSION

I.   Standard of Review

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545

II.   The Hostile Work Environment Claims

Plaintiff alleges that Quinn Emanuel and David Eskanos subjected him to a discriminatory, hostile work environment in violation of the New York City Human Rights Law (NYCHRL), the New York State Human Rights Law (NYSHRL), and 42 U.C.S. § 1981. *See* Counts I, III, and V. Defendants argue that Plaintiff's hostile work environment claims under the NYSHRL and the NYCHRL fail because they are untimely, and the Plaintiff's claims under § 1981 and the NYSHRL fail because Plaintiff has not alleged a severe or pervasive hostile work environment.

A. *Plaintiff's hostile work environment claims are timely.*

Plaintiff's hostile work environment claims are not time barred.

The statute of limitations for any claim brought pursuant to the NYSHRL or the NYCHRL is three years.[1] Defendants argue that Plaintiff's NYSHRL and NYCHRL hostile work environment claims are untimely because Plaintiff does not plead that any discriminatory conduct took place within the three-year limitations period. *See* Defendants' Memorandum of Law in support of their Motion to Dismiss the Amended Complaint ("Mem."), Dkt No. 24, at 8. Plaintiff initiated this action on March 23, 2021. So for his NYSHRL and NYCHRL claims to be timely, he must allege that at least *one* of the acts complained of that created or contributed to the alleged hostile work environment took place after March 23, 2018.

In *National Railroad Passenger Corp. v. Morgan*, the Supreme Court explained that "a hostile work environment claim ... will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." 536 U.S. 101, 122 (2002). As this court stated in *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 582 (S.D.N.Y. 2011), "the continuing-violation exception should be applied to hostile work environment claims because such claims challenge 'repeated conduct' that 'occurs over a series of days or perhaps years.'" *Id.* (quoting *Morgan*, 536 U.S. at 115). Thus, "so long as one act is within the limitations period, all of the acts can be relied on to show a hostile work environment." *Bermudez*, 783 F. Supp. 2d at 582; *see also Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir.2009); *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir.2004).

Mondelo has alleged that at least one act which contributed to the hostile work environment occurred within the limitations period. For example, Plaintiff alleges that in the spring of 2019,

---

[1] N.Y. C.P.L.R. 214(2); N.Y.C. Admin. Code § 8-402; *see Bermudez v. City of New York*, 783 F. Supp. 2d 560, 573 (S.D.N.Y. 2011) (statute of limitations for claims under the NYSHRL and the NYCHRL is three years).

Mr. Eskanos targeted Mr. Mondelo by forcing him to roll out a new Windows operating systems that Mr. Eskanos knew had serious issues and would cause major disruption in the New York office, while allowing the London IT Director, who is not Hispanic, to pause the London office rollout. Am. Compl ¶¶ 54-58.

So Plaintiff has pleaded a least one act that occurred within the limitations period. And "because the continuing-violation exception is applied in the same way whether the claim is under federal, state, or city law," all of Mondelo's hostile work environment claims are timely. *Bermudez*, 783 F. Supp. at 582 (applying the continuing violation exception to claims under §1981, the NYSHRL, and the NYCHRL).

B. *Plaintiff's hostile work environment claims are adequately pleaded.*

Mondelo brings three separate hostile work environment claims: (1) Count I is a Section 1981 claim against Quinn Emanuel; (2) Count V is a NYSHRL claim against Quinn Emanuel and David Eskanos; and (3) Count III is a NYCHRL claim against Quinn Emanuel and David Eskanos.

As a threshold matter, the court notes that all of the challenged actions directed at Mondelo amounting to a hostile work environment were actions taken by Defendant Eskanos. Mondelo alleges that Quinn Emanuel knew about the on-going discrimination perpetrated by Eskanos and failed to adequately address or remedy the situation.

But Quinn Emanual is named as a Defendant in all three of Mondelo's hostile work environment claims. So I must first determine whether Mondelo sufficiently pleaded a specific basis for imputing Eskanos's actionable conduct to their common employer, Quinn Emanuel. *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995).

Whether the harassing conduct of a supervisor or coworker should be imputed to the employer is determined in accordance with common-law principles of agency. *Id.* Eskanos was

Mondelo's supervisor, and when a supervisor wields the authority delegated to him by an employer to further the creation of a discriminatorily abusive work environment, the supervisor's conduct is deemed to be that of the employer and the employer's liability for that conduct is absolute. *Id.* (citing *Karibian v. Columbia University*, 14 F.3d 773, 779 (2d Cir.)).

Alternatively, liability attaches to an employer that has notice of an abusive environment but does nothing about it. *Id.*; *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986). Eskanos allegedly used his position at the Firm – as Mondelo's supervisor – to interact with Mondelo in an abusive and discriminatory manner. And Mondelo alleges that Quinn Emanuel was made aware of the abusive environment created by Eskanos and did nothing about it. Thus, if I conclude that Mondelo has stated a hostile work environment claim against Eskanos, liability is imputed to Quinn Emanuel.

I address Mondelo's three hostile work environment claims in turn.

    i.   <u>Count I: hostile work environment under Section 1981</u>

Section 1981 provides that, "All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). In practice, the statute "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir.2004).

I note that most federal employment discrimination claims are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the "*McDonnell Douglas* framework"), discussed more fulsomely below. *See infra*, section III.A. Federal hostile work environment claims, however, are not analyzed under the *McDonnel Douglas* framework. *Spence v. Bukofzer*, No. 15-CV-6167, 2017 WL 1194478, at

*6 (S.D.N.Y. Mar. 30, 2017). Instead, federal hostile work environment claims are analyzed under the "severe or pervasive" standard, which requires that the alleged conduct "be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106–07 (2d Cir. 2011) (per curiam) (analyzing hostile work environment claim under the "severe or pervasive" standard and retaliation claim under *McDonnell Douglas*).

To state a § 1981 hostile work environment claim, a plaintiff must allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir.2014). Courts "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (quoting *Harris*, 510 U.S. at 23). And in this Circuit, Plaintiff "need not show that [his] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions." *Pucino v. Verizon Commc'n, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphases in original).

Mondelo alleges that "In violation of 42 U.S.C. § 1981, Quinn Emanuel intentionally discriminated against Plaintiff on the basis of his Hispanic race and/or his Spanish ancestry" by "subjecting Plaintiff to a hostile work environment." Am. Compl. ¶¶ 89-90 (Count I).

Defendants argue that Plaintiff's § 1981 claim must be dismissed because the single derogatory comment ("spic") made by Eskanos is not severe or pervasive enough as to alter the conditions of Mr. Mondelo's employment and create an abusive working environment. Mem. 11.

While "even a single episode of harassment, if severe enough, can establish a hostile work environment," *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir.1999), *abrogated on other grounds by Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), I might agree with Defendants if that were all that Plaintiff alleges. But it is not. Mondelo alleges that Eskanos exhibited a *pattern* of continuous harassment and disparate treatment extending over a period of years. He alleges that Eskanos made his job harder by setting unreasonable deadlines, denying overtime, and denying travel requests. And he contends, using examples, that Eskanos treated Mondelo's non-Hispanic counterparts differently (and better) than he treated Mondelo, and did not interfere with their ability to do their jobs in the same way he did with Mondelo.  Mr. Mondelo alleges that he, the only Hispanic IT director, was the only director excluded from weekly department meetings. It does not matter that not all of the alleged conduct was *explicitly* discriminatory: Second Circuit "case law is clear that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

Mondelo need only allege hostility pervasive enough that reasonable people would consider their working conditions to be altered as a result.  And I conclude that reasonable people

would consider their working conditions to be altered if Mondelo were able to prove what he alleges – which is that Eskanos made it difficult or impossible for Plaintiff to do his job effectively in a variety of ways. Other courts sitting in this Circuit have agreed.  *See Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 115 (2d Cir. 2010) (hostile work environment found based on, *inter alia*, supervisor denied plaintiff tools which "made it difficult, if not impossible, for her to perform her work properly"); *Spence v. Bukofzer*, No. 15 CIV. 6167 (ER), 2017 WL 1194478, at *8 (S.D.N.Y. Mar. 30, 2017) (allegations that plaintiff was excluded from work meetings, received unfavorable assignments, was demoted, and complained internally about a racially hostile environment "plausibly describes an objectively hostile work environment that could have reasonably interfered with her ability to work").

The cases cited by Defendants in support of dismissal are all distinguishable. Some of them did not arise on motions to dismiss, but were summary judgment motions, when the allegations of the complaint are no longer presumed true but must be supported by admissible evidence. *E.g., Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (summary judgment decision); *Demoret v. Zegarelli*, 451 F.3d 140, 150 (2d Cir. 2006) (summary judgment decision; no allegation of the use of a derogatory comment). Others did not involve the type of claims made in this case, or did not involve the use of a slur or derogatory comment directed at the plaintiff. *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (no use of a racial slur alleged).

Next, Defendants argue that Plaintiff's Section 1981 claim fails because he does not allege that Eskanos's creation of a hostile work environment was motivated by animus towards Mondelo as a result of his membership in a protected class. Mem. 14. Defendants are correct that a hostile work environment plaintiff must allege that the severe or pervasive conduct at issue was, at least partially, motivated by a discriminatory intent. According to Defendants, "outside of the single

untimely comment, there is no non-conclusory allegation that any of the subsequent conduct occurred because of Plaintiff's protected class." Mem. 14.

But Plaintiff "can raise an inference of a discriminatory motive in a number of ways, including by ... pleading specific facts suggesting that other, similarly situated employees outside of the plaintiff's protected class were treated better than the plaintiff." *Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at \*9 (S.D.N.Y. Feb. 28, 2019). And Plaintiff did precisely that. Specifically, he alleges that Eskanos exhibited animosity towards Plaintiff on the basis of his race and national origin by excluding him from meetings, refusing to approve his order requests, refusing overtime requests for Plaintiff's staff, and by requiring Plaintiff submit detailed justifications for travel only to (mostly) deny Plaintiff's travel requests. Am. Compl. ¶¶ 32-34 35-36, 38-40. And according to the allegations, Eskanos's conduct was not facially neutral because Eskanos did not treat Plaintiff's non-Hispanic counterparts the same way. He alleges that Eskanos demoted him from his job as a regional manager and stripped him of his regional responsibilities, and then replaced Plaintiff with a non-Hispanic person. *Id.* ¶¶ 46-50. Mondelo also alleges that Eskanos forced Plaintiff to prematurely roll out a new operating system and denied Plaintiff access to technical support, while, at the same time, Eskanos did not force Plaintiff's non-Hispanic counterparts in London to do the same. *Id.* ¶¶ 58-64. The facts as alleged raise an inference of discriminatory motive. *See Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB) (HBP), 2014 WL 1259616, at \*3, \*11 (S.D.N.Y. Mar. 24, 2014) (denying a motion to dismiss a hostile work environment claim where the plaintiff alleged that he "was treated 'less well' than younger, less qualified employees" and provided specific examples, such as inequitable distribution of overtime opportunities and work assignments). Whether Mondelo can prove what he alleges is another matter altogether.

Finally, I note that determining whether conduct is severe or pervasive enough to create a hostile work environment involves a question of fact and is generally inappropriate to determine at the pleadings stage of a litigation. *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007) ("whether a particular work environment is objectively hostile is necessarily a fact-intensive inquiry"); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (the existence a hostile work environment is a "mixed question of law and fact" because it involves "the application of a legal standard to a particular set of facts") (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 737 (2d Cir.1983)). As my colleague Judge Failla observed, it is particularly difficult "for courts to perform the extraordinarily sensitive and comprehensive analysis necessary to assess a total set of workplace circumstances and determine whether a particular set of words and actions were enough to make that workplace a different, less tolerable environment for the victimized party." *Pryor*, 992 F. Supp. 2d at 259.

The Second Circuit has "repeatedly cautioned against setting the bar too high" on the standard for stating a hostile work environment claim. *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). At this stage, Plaintiff's allegations – that he received disparate treatment and that Eskanos used an explicit, racial slur to describe him – are enough.

Accordingly, Defendants' motion to dismiss Count I is denied.

ii.  Count V: hostile work environment under the NYSHRL

Count II of the Amended Complaint is a NYSHRL hostile work environment claim against Defendants Quinn Emanuel and David Eskanos.

Until fairly recently, the standard applicable to hostile work environment claims brought pursuant to the NYSHRL mirrored the federal standard. But on October 11, 2019, amendments to the NYSHRL came into effect that eliminated the "severe and pervasive" standard. N.Y. Exec.

Law § 300. The new standard requires a plaintiff allege that they were subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more ... protected categories." *Id.* This updated and more lenient standard is similar to the standard for stating a hostile work environment claim under the NYCHRL, discussed below. However, the amendment to the NYSHRL is not retroactive, meaning that the "severe and pervasive" standard applies to claims arising from conduct predating the effective date of the amendments. *McHenry v. Fox News Network, LLC*, 2020 WL 7480622, at *8 (S.D.N.Y. Dec. 18, 2020).

Because Plaintiff's claims are based on conduct that occurred prior to October 2019, the court applies the federal analog's "severe and pervasive standard" to Plaintiff's NYSHRL hostile work environment claim (Count V). *Bermudez v. City of New York*, 783 F.Supp.2d 560, 587 (S.D.N.Y.2011).

For the reasons articulated above, Plaintiff has stated a hostile work environment claim under the NYSHRL against Eskanos. And because Eskanos is Quinn's agent as a matter of state law, his conduct can be imputed to Quinn Emanuel. Therefore, Count V survives as against both named Defendants: Quinn Emanuel and Eskanos.

Defendants' motion to dismiss Count V is denied.

### iii.  Count III: hostile work environment under the NYCHRL

Count III is a hostile work environment claim against Quinn Emanuel and Eskanos brought the NYCHRL. "The standard for maintaining a hostile work environment claim is lower under the NYCHRL." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011).  Indeed, "The New York City Human Rights Law was intended to be more protective than the state and federal counterpart." *Id.* (quoting *Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d 718, 724 (N.Y.Sup.Ct.2006). The NYCHRL imposes liability for hostile conduct even where the conduct

does not rise to the level of "severe or pervasive," as "questions of severity and pervasiveness are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (2009).

"Because Plaintiff has adequately pled a claim under the [old standard] NYSHRL, [he] has also done so under the NYCHRL." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 260 (S.D.N.Y. 2014); *see also Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 48 (S.D.N.Y.2009) ("if a plaintiff successfully states a claim under the NYSHRL, then '[a] fortiori' she has stated a claim under the NYCHRL") (alteration in original) (quoting *Brightman v. Prison Health Servs., Inc.*, 878 N.Y.S.2d 357, 358 (2009)).

Defendants' motion to dismiss Count III is denied.

III.    The Retaliation Claims

Counts II, IV, and VI are retaliation claims.  Mondelo alleges that, in violation of federal, state, and city law, Quinn Emanuel and Eskanos retaliated against him for complaining to HR and to Mr. Calamari about Eskanos's discriminatory conduct.

To prevail on his retaliation claims, Mr. Mondelo need not prove that his "underlying complaint of discrimination had any merit," only that his underlying complaint was motivated by a "good faith, reasonable belief" that the conduct complained of was unlawful. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir.2012); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996)).

I address the three retaliation claims in turn.

A.   *The motion to dismiss Count II (Section 1981 against Quinn Emanuel) is denied.*

Mondelo alleges that, in violation of 42 U.S.C. 1981, Defendant Quinn Emanuel retaliated against him for reporting Eskanos's discriminatory conduct. The text of the statute does not

prohibit (or even mention) retaliation, but the Supreme Court made clear, in *CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008), that workplace retaliation is actionable under Section 1981. *CBOCS W.*, 553 U.S at 451 ("§ 1981 encompasses retaliation claims"). Section 1981 retaliation claims are governed by the same standards as retaliation claims brought under Title VII and are therefore analyzed using the *McDonnell Douglas* three-part burden-shifting framework. *Zann Kwan v. Andalex Grp.* LLC, 737 F.3d 834, 843 (2d Cir. 2013).

Under *McDonnel Douglas*, the burden initially falls on a plaintiff to plead a *prima facie* retaliation case. To state a *prima facie* case, Plaintiff must allege (1) that he participated in a protected activity, (2) that his participation was known to his employer, (3) that his employer thereafter subjected him to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff's burden of proof at the *prima facie* stage is *de minimis*. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). If and when the initial burden is met by the plaintiff, a "presumption of retaliation" arises, which the defendant may rebut by "articulating a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides such a reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

Mondelo alleges that "Quinn Emanuel intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of discrimination based on his Hispanic race and/or Spanish ancestry" by "subjecting Plaintiff to a

hostile work environment, increased scrutiny, and threats of termination," by "demoting him," and by "terminating Plaintiff's employment." Am. Compl. ¶ 18 (Count II).

Plaintiff points to multiple adverse employment actions; not just his demotion and firing, but also that he was subjected to Eskanos's persistent harassment and abuse because of his race. A cognizable "adverse employment action" is any conduct "that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Duplan v. City of New York*, 88 F.3d 612, 626-27 (2d Cir. 2018) (quotation marks omitted). In the retaliation context, an "adverse employment action" encompasses "a broader range of conduct than does the adverse-action standard for claims of discrimination" as it does not require that the "discriminatory actions . . . affect the terms and conditions of employment." *Id.* at 90 (quotation omitted). To determine whether any of the alleged conduct amounts to an adverse employment action, the challenge actions must "be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quotation marks omitted).

Defendants primarily challenge causation; they argue that Plaintiff has not alleged a causal link between the alleged protected activity (reporting Eskanos's discriminatory conduct to HR and Calamari) and *any* of the alleged adverse employment actions. A causal link is alleged either by pleading facts to support the inference that the defendant was motivated by retaliatory animus, or by pleading a close temporal proximity between the protected activity and the retaliatory action. *Summer v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir.2009).

Specifically, Defendants assert that Plaintiff's demotion cannot be linked to his HR complaint because he was demoted two and a half years after he reported Eskanos to HR. And Plaintiff was terminated three and a half years after he complained to HR. So Plaintiff has not and

cannot allege a close temporal proximity between his HR report and his demotion or subsequent termination. And Mondelo pleads no other facts suggesting that Quinn Emanuel's decision to demote or to fire Plaintiff was motivated by retaliatory animus.

I disagree.

Plaintiff alleges that after he complained to HR, "in continuation of his prior race/ancestry-based mistreatment of Plaintiff, and in clear retaliation of Plaintiff's hostile work environment complain, he continued singling Plaintiff out and *began* sabotaging Plaintiff's ability to succeed at the firm." Am. Compl. ¶ 29 (emphasis added). All of the alleged actions taken by Mr. Eskanos to sabotage Plaintiff's ability to succeed at his job were taken after Plaintiff complained to HR.

Plaintiff alleges a causal connection by a slim margin. But the allegations are enough for a claim of retaliation to survive a motion to dismiss for failure to state a claim. Defendants will have the opportunity to demonstrate that the adverse employment actions taken were motivated by legitimate, non-discriminatory reasons. But that is only appropriate for the court to take up at the summary judgment stage. We will revisit the issue at that stage in the litigation. But at this stage, the pleadings are sufficient.

Defendants' motion to dismiss Count II is denied.

B. *The motion to dismiss Count VI (NYSHRL against Quinn Emanuel and Eskanos) is denied.*

Count II is a retaliation claim brought against Defendants Quinn Emanuel and David Eskanos for violations of the NYSHRL. Under the NYSHRL, it is unlawful to retaliate or discriminate against an employee because he "has opposed any practices forbidden under this article or because ... [he] has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

Plaintiff's NYSHRL retaliation claim mirrors his Section 1981 retaliation claim: he alleges that "Quinn Emanuel and David Eskanos intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity" by "subjecting Plaintiff to a hostile work environment, increased scrutiny, and threats of termination; stripping Plaintiff of his job duties and demoting him; and terminating Plaintiff's employment." Am. Compl. ¶¶ 125-6.

Retaliation claims brought under the NYSHRL are governed by the same standards as retaliation claims brought under Section 1981. *Zann Kwan*, 737 F.3d at 843. So Plaintiff's NYSHRL retaliation claim survives for the same reason his Section 1981 retaliation claim survives.

Defendants' motion to dismiss Count VI is denied.

C. *The motion to dismiss Count IV (NYCHRL against Quinn Emanuel and Eskanos) is denied.*

The NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). The "adverse employment action" pleading standard is more lenient under the NYCHRL than under Section 1981 and the NYSHRL.[2]  To state a retaliation claim under the NYCHRL, a plaintiff "does not have to allege a materially adverse employment action," only a retaliatory act that is "likely to deter a person from engaging in the protected activity." *Bermudez*, 783 F. Supp. 2d at 588.

---

[2] Under the NYCHRL, "The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7)

Because the Section 1981 and NYSHRL retaliation claims survive, so too does the NYCHRL retaliation claim, which is judged under a more lenient standard than its state and federal counterparts.

Defendants' motion to dismiss Count IV is denied.

III.    The Aiding and Abetting Claims

Mondelo brings claims for aiding and abetting discriminatory conduct in violation of the NYCHRL and the NYSHRL against Defendant Peter Calamari. *See* Counts VII and VIII. The aiding and abetting claims hinge on Mr. Calamari's purported failure to take adequate remedial action in response to Plaintiff's complaints about Eskanos's discriminatory conduct. Am. Compl. ¶¶ 134, 138. From September 2015 (when Plaintiff first complained to HR about Eskanos) to March 2018, Mr. Calamari acted as a "buffer" between Plaintiff and Eskanos. *Id.* ¶ 27. Plaintiff alleges that during the "buffer period," he went to Calamari on numerous occasions about Eskanos's persisting unequal treatment and inference with Plaintiff's ability to do his job. According to Mondelo, Calamari took no action against Mr. Eskanos; instead, Calamari merely asked Plaintiff to "try to work it out." Am. Compl. ¶ 45.

Under both the NYSHRL and the NYCHRL, "an individual employee may be held liable for aiding and abetting discriminatory conduct." *Krause v. Lancer & Loader Grp.*, 40 Misc.3d 385, 965 N.Y.S.2d 312, 323 (Sup. Ct., N.Y. Cty. 2013). The language of the NYSHRL and the NYCHRL is identical as to aiding and abetting liability; both provide that "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6); N.Y.C. Admin Code § 8-107(6)); *see also Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) ("because the

language of the two laws is virtually identical," the same standard governs aiding and abetting claims under the NYSHRL and NYCHRL).

To state an aiding and abetting claim, a plaintiff must plead that the alleged aider and abettor "actually participated" in the discriminatory conduct of the primary violator. *Farmer v. Shake Shack Enters.*, LLC, 473 F.Supp.3d 309, 337 (S.D.N.Y. 2020). Liability "must first be established as to the employer/principal before an individual may be considered an aider and abettor." *Davis-Bell v. Columbia University*, 851 F. Supp. 2d 650, 688 (S.D.N.Y. 2012).

So I must decide whether Plaintiff has adequately alleged that Mr. Calamari *participated* in Eskanos's discriminatory and retaliatory conduct (*e.g.* using a racial slur, excluding Mondelo from meetings, degrading him, denying him resources, and imposing deadlines that were impossible for Mondelo to meet).

Plaintiff does not allege that Mr. Calamari *directly* participated in Eskanos's misconduct. But Mr. Calamari can still be liable for aiding and abetting if he failed in a supervisory capacity to take appropriate remedial or investigative measures. And indeed, "A supervisor's failure to take adequate remedial measures in response to a complaint of discrimination can, *with proper factual allegations,* constitute actual participation. *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 555 (S.D.N.Y. 2014)(Emphasis added).

Defendants argue also that the aiding and abetting claims against Calamari must be dismissed because "it is undisputed that Calamari had no supervisory role over Plaintiff." Mem. 22. At this preliminary stage, I cannot agree with this contention. The Amended Complaint states that, starting in October 2015, Mr. Calamari acted as a "buffer" between Mondelo and his supervisor, Eskanos. Am. Compl. ¶ 27. I can certainly infer that as a "buffer" between Plaintiff and Plaintiff's supervisor, Calamari acted as an intermediate supervisor to Plaintiff. And as then-

managing partner of Quinn's New York office, the office at which Plaintiff was based, Calamari was senior in rank to Mondelo; even if he was not technically Mondelo's supervisor, he was in a position of authority and may well have had power over Mondelo's work activities. So it is hardly "undisputed" that Calamari had no supervisory role over Plaintiff. In fact, Mondelo specifically pleaded that in at least one instance he went to Calamari for supervisory assistance: in preparing a budget for the D.C. office move, Mondelo "first presented the draft budget to Mr. Calamari, who assisted him with crafting a letter to Mr. Eskanos explaining the reasons for the requested budget." Am. Compl. ¶ 42.

However, Defendants are correct when they urge that Plaintiff has failed to plead the "proper factual allegations" necessary to state a claim of supervisory liability under the State and City statutes.

Under both of these laws, aiding and abetting liability does not attach to a supervisor unless the facts alleged demonstrate that the aider and abettor shared the intent or purpose of the principal actor. "There can be no partnership in an act where there is no community of purpose." *Warren v. Ultimate Fitness Grp.*, LLC, No. 19-CV-10315 (KMK), 2021 WL 4239246, at *5 (S.D.N.Y. Sept. 17, 2021) (quoting *Fried v. LVI Servs., Inc.,* 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011)).

As Defendants correctly point out, Mondelo has not pleaded any facts from which a trier of fact could infer that Mr. Calamari failed to intervene because he too harbored an intent to discriminate against Mr. Mondelo because he was Hispanic. The court can infer Mr. Eskanos's discriminatory intent at the pleading stage because Plaintiff has pleaded facts tending to show, if believed, that Eskanos treated Plaintiff's non-Hispanic counterparts better than he treated Mr.

Mondelo. But no facts are similarly pleaded that would allow a trier of fact to draw the same inference about the intentions of Mr. Calamari.

Plaintiff would have the court draw the inference that Mr. Calamari harbored an anti-Hispanic bias based on his purported failure to take appropriate remedial measures despite Mondelo's repeated complaints. But, "Failing to respond to others' violations of the NYSHRL [and the NCYHRL] does not, without more, support aiding and abetting liability." *Warren*, 2021 WL at *5-6. In *Warren*, Judge Karas of this District denied the plaintiff's motion to amend her complaint to add a claim of aiding and abetting under the NYSHRL against the third-party human resources company that her employer contracted with for failing to adequately address and remedy her complaints. Judge Karas denied the motion because new allegations that the HR company responsible for handling the plaintiff's complaints "should have done more" or should have "responded differently" to the complaints "does not amount to active participation in the [primary violator's] alleged harassment and discrimination." *Id.* at *6. The court held that, "Mere ineptitude and insensitivity in response to a complaint of harassment standing along is insufficient to support a finding of personal liability" necessary to state a claim for aiding and abetting. *Id.* (quoting *Beattie v. Farnsworth Middle Sch.*, 143 F. Supp. 2d 220, 230 (N.D.N.Y. 1998)). And, without more, aiding and abetting liability does not attach in this Circuit "for failing to adequately investigate a claim of discrimination." *Kalola v. Int'l Bus. Machines Corp.*, No. 13 CV 7339 (VB), 2015 WL 861718, at *11 (S.D.N.Y. Feb. 3, 2015); *see also Karibian v. Columbia Univ.*, 930 F. Supp. 134, 146 (S.D.N.Y.1996) (the aiding and abetting laws do not contain language "expressly creating liability for failure to investigate and remedy a complaint of discrimination").

Because Mr. Calamari's failure to take remedial measures does not in and of itself establish aiding and abetting liability, the aiding and abetting claims against him fail.

Accordingly, Counts VII and VIII are dismissed. But I will dismiss them without prejudice, giving Plaintiff 21 days to file an amended complaint in which he pleads *facts* (not mere conclusions) tending to show that Mr. Calamari shared Mr. Eskanos's intent to discriminate. If he fails to do so, the dismissal of these counts without prejudice will be converted to dismissal with prejudice.

## CONCLUSION

For the reasons discussed above, the motion to dismiss Counts VII and VIII of the Amended Complaint is granted, without prejudice; the motion to dismiss is otherwise denied, as is Defendants' motion to stay discovery.

This constitutes the decision and order of the court. It is a written opinion. The Clerk of Court is respectfully directed to terminate the motion at Docket Number 23.

Dated: February 22, 2022
New York, New York

U.S.D.J.

BY ECF TO ALL COUNSEL

28